UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Daniel L. Thompson,

       Plaintiff,

       v.                        Civil Action No. 1:12-cv-225

Prison Health Care et al,

       Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 13, 14, 15, 19, 21, 24, 29, 30, 38)

Plaintiff Daniel L. Thompson, proceeding *pro se*, has filed this action pursuant to

42 U.S.C. § 1983, alleging that Defendants, officials at the Vermont Department of

Corrections ("DOC"), violated his constitutional rights after he received improper and

ineffective treatment before and after shoulder surgery for a torn rotator cuff suffered

while in DOC custody.  (Doc. 27.)[1]  Since the commencement of this action, many

motions have been filed.

Upon the filing of the original Complaint (Doc. 5), numerous Motions to Amend

followed (Docs. 19, 20, 21), which were ultimately granted (Doc. 26).  Thompson also

---

[1]  Thompson's Amended Complaint makes no reference to 42 U.S.C. § 1983, nor does it cite any
specific constitutional provision.  (Doc. 27.)  His original Complaint, however, did allege a violation of §
1983 (Doc. 5 at 1) and cite the text of the Eighth Amendment in its allegation of "cruel [and] unus[u]al
punishment" (*id.* at 4).  This, along with the Amended Complaint's repeated reference to the applicable
Eighth Amendment standard of "deliberate indifference" (Doc. 27 at 1, 4, 7), as well as his response's
multiple references to that standard (Doc. 33 at 1-6), clears up any conceivable confusion as to the basis
of Thompson's claims.  Despite the reference to the Eighth Amendment and its applicable legal standard,
Thompson's claim is, in fact, grounded in the due process clause of the Fourteenth Amendment given his
status as a state pretrial detainee at the time of the events in question.  *See Bell v. Wolfish*, 441 U.S. 520,
535 n.16 (1979).  This does not change the applicable legal standard.  *See infra*.

sought the appointment of counsel (Doc. 19-1 at 2), which was denied (Doc. 26 at 6-7).

Other pending motions—including Motions to Dismiss by certain Defendants (Docs. 13,

14), Motions for Summary Judgment by Thompson (Docs. 15, 19, 24), and a motion by

Thompson requesting that he be permitted to respond to the motions to dismiss using the

Amended Complaint (Doc. 21)—predate the filing of the Amended Complaint. Since the

filing of the Amended Complaint (Doc. 27), certain Defendants have moved to dismiss

for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P.

12(b)(6) (Doc. 29). Thompson filed a response to the pending Motion to Dismiss in

which he again sought the appointment of counsel (Docs. 33, 38), as well as a "Motion

for Admission of Undisputed Facts from Party Opponents" (Doc. 30).

For the reasons that follow, I recommend that the most recent Motion to Dismiss

filed by Defendants Pallito, Hale, and Shana (Doc. 29) be GRANTED. Although I

recommend dismissal, I also recommend that counsel for these Defendants, the Vermont

Attorney General's Office, be ordered to release forthwith to Thompson all reports

regarding his medical treatment, and to assist Thompson in ascertaining the identities of

all individuals involved in his treatment, pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d

Cir. 1997).

As to the remaining motions, I recommend that Thompson's "Motion for

Admission of Undisputed Facts from Party Opponents" (Doc. 30) be DENIED. I further

recommend that all motions filed prior to the Amended Complaint (Docs. 13, 14, 15, 19,

21, 24) be DENIED AS MOOT. Finally, Thompson's Motion to Appoint Counsel (Doc.

38) should be DENIED without prejudice.

## Facts and Procedural Background

Daniel Thompson is a sixty-one year old inmate in the custody of the DOC. (Doc. 27 at 1.) On September 26, 2009, Thompson began his imprisonment at Chittenden Community Correctional Facility[2] after a brief hospitalization following a car accident allegedly caused by his intoxication. (*Id*. at 2.) By Thompson's description, he was charged with "DUI accident resulting," and the initial period of his incarceration was approximately nine to ten months "until [he] posted bail at a later date." (*Id*.) During this time, he was "detoxing from alcohol," which caused "confusion, tremors, hallucinations, sweats, disorientation, [his] left eye [to swell] shut, migraines, trouble walking, slurred speech, uncertainty of [his] whereabouts, as well as other physical ailments." (*Id*.) Thompson brought these problems to the attention of officers and medical staff at the facility, noting that he "was afraid of [his] mental condition, and that [he] was not being cared for adequately." (*Id*.) He "asked for help repeatedly, but [his] repeated polite requests fell on deaf ears." (*Id*.)

On the third day of his incarceration, after spending the first two days in segregation, Thompson suffered a seizure. (*Id*. at 3.) The seizure put Thompson into a "semi-conscious state" during which he recalled "at least three or four officers," including Shana (a Defendant here), "standing over [him] laughing." (*Id*.) Shana in particular was "holding [a] video camera," apparently filming Thompson. (*Id*.) During the episode, Shana, along with the other guards, were saying things such as "He's faking

---

[2] According to the Motion to Dismiss, Thompson was housed at the Chittenden Community Correctional Facility. (Doc. 29 at 1.) Throughout his Amended Complaint, Thompson refers to this facility only as "CCCC." (Doc. 27.)

it. Save a bed for him. If he does go anywhere, he'll be back soon." (*Id.*) This taunting "happened several times." (*Id.*)

Later that day, Thompson was taken to the emergency room at Fletcher Allen Health Care. (*Id.*) When a guard suggested that Thompson would be taken back to the prison facility, Thompson's treating physician recommended he remain at the hospital. (*Id.*) After the officer overruled the physician and began to wheel Thompson out of the hospital, he "apparently" suffered another seizure and woke up back in the emergency room. (*Id.*) Thompson was again made to leave over the physician's objection. (*Id.*) Finally, after he suffered a third seizure, Thompson was allowed to remain at the hospital for "about four and one-half days." (*Id.* at 4.) After a battery of "MRIs, X-rays, blood tests, and whatever else was performed," Thompson was returned to the prison facility "with a massively torn rotator cuff among other injuries which were not present following the alleged DUI accident, but which came to light after the seizure and the fall in the hallway." (*Id.*)

A physician, who Thompson identifies as "Doctor Endgress," was called to the facility to address the shoulder injury, and "wrote an order to schedule shoulder surgery within one week" and "prescribed [Thompson] some sort of pain medication." (*Id.*) "A few days later," Thompson saw another doctor at the prison who agreed that he had torn his rotator cuff due to his seizure and fall, but declined to provide pain medication because the doctor was "not a fan" of prescribing Vicodin in a prison. (*Id.*) According to Thompson, he "wasn't even prescribed Motrin." (*Id.*) Thompson continued to "put in

numerous medical slips" requesting pain medication, but he "never heard back" on any of these requests. (*Id*.)

Thompson identifies a range of physical problems he experienced until he was allowed to have shoulder surgery. (*Id*. at 5.) He was "using a crutch to walk around" making "just walking . . . very difficult for me." (*Id*.) He was also "suffering from migraines" and having headaches "mostly every day." (*Id*.) His "great" shoulder pain and its associated limitations meant that he could not use his left arm because it was in a sling, and thus he was unable to "take care of [him]self in the most basic of ways," including hygienically and nutritionally.[3] (*Id*.) Furthermore, his left eye was "swelled shut," presumably from the fall, and his shoulder pain meant that "sleep was very limited." (*Id*.) In mid-December 2009, after waiting over two and one-half months, Thompson had his shoulder surgery. (*Id*.)

After the surgery, the hospital doctor informed Thompson that he needed to see a physical therapist within "four or five days" to "start moving [his] arm for [him]." (*Id*.) Otherwise, the arm could "lock up and freeze," which would cause him "a lot more trouble." (*Id*.) The doctor also prescribed medication for Thompson. (*Id*.) Upon Thompson's return to prison, guards confiscated his hospital paperwork and returned him to his cell rather than an infirmary for continued recovery. (*Id*.) The nurse at the facility refused to assist Thompson with his "cryo cuff," which he was supposed to wear after the

---

[3] According to the Complaint, one commanding officer told Thompson, after he requested to have food trays brought to his unit, that: "If you want to eat badly enough, you'll go down to the chow hall and get a tray. I'm not going to have a tray brought down. This is jail, not a fucking baby-sitting service." (Doc. 27 at 5.)

surgery. (*Id*. at 6.) Unable to lie on his bunk bed while wearing the cuff, Thompson ultimately had his cellmate move his mattress to the floor so he could sleep on it, even though he remained in "excruciating pain." (*Id*.) According to Thompson, several commanding officers and shift supervisors noticed his difficulties, as he "made them aware that [he] was suffering from a disability" and that they had refused him "reasonable accommodation." (*Id*.) Their "most common response" was: "I'll look into it and have next shift get back to you." (*Id*.) This never happened. (*Id*.) Thompson "put in several medical slips on this matter," and was told that they would not handle his housing problems.[4] (*Id*.) After the "first couple of weeks" since his surgery, Thompson grew more concerned that he had not had any physical therapy or "been seen or even contacted by the medical staff" at the prison. (*Id*. at 7.) Thompson continued to sleep on the mattress on his cell floor "for at least six weeks," though "[i]t may have been longer" since he "cannot recall a precise timeframe." (*Id*.)

After "several more medical requests to see the doctor," Thompson was called to the infirmary. (*Id*.) Thompson recited his various ailments for a nurse, including his need for physical therapy for his arm and shoulder. (*Id*.) "Four or five days" after this meeting with the nurse, Thompson was allowed to have a "face-to-face sit-down with the doctor." (*Id*.) During this meeting, the doctor was, by Thompson's description, "very standoffish, short, and [did] not really want[] to listen to what [Thompson] wanted to

---

[4] Thompson also notes in his Amended Complaint that, around this time, there was a period of approximately four to six weeks in which the facility was giving out medical slips "without any carbon copies." (Doc. 27 at 6.) When challenged on this procedure, facility officials noted that the slips would "have to do for now" until they could get proper forms. (*Id*.)

say." (*Id.*) Thompson's recollection of the meeting was that the doctor told him that he seemed to be "doing okay" and his "medication should be holding [him] well." (*Id.*) Thompson recalls feeling as though he was not "being taken seriously in what [he] was trying to say." (*Id.*) When Thompson asked the doctor specifically about his lack of physical therapy, the doctor proceeded to demonstrate a particular shoulder rotation and tell Thompson to engage in that exercise to "keep it from locking up." (*Id.* at 8.) Thompson repeated his request for "physical therapy from a qualified physical therapist," but the doctor was again "vague" and "didn't really have an answer." (*Id.*) After more discussion on the subject, the doctor ended the appointment. (*Id.*)

Thompson continued to make verbal requests for medical attention. (*Id.*) After waiting over two additional months, Thompson was transported out of the prison facility to see a physical therapist in South Burlington. (*Id.*) After taking initial measurements and noting Thompson's pain, the physical therapist stated that she could not "do much of anything" for Thompson on that day other than "assess" his condition. (*Id.* at 9.) She noted that Thompson "should have been seen right after surgery" and expressed an interest in his continuing to be seen "two or three times per week." (*Id.*) At the end of the appointment, the therapist printed out "a couple of exercises" for Thompson to "do at the jail"; prison guards later confiscated this paperwork and denied Thompson's requests for its return. (*Id.*) This was Thompson's "one and only physical therapy session." (*Id.*)

A week later, Thompson was given the exercise paperwork by a prison nurse, who wished him "the best of luck" with his recovery. (*Id.*) Thereafter, Thompson began attempts to "self-rehabilitate" his shoulder, while renewing requests to prison officials for

medical attention. (*Id*.) Around May 2010, Thompson began to exercise and has made modest gains in strength since, but his "shoulder still lagged behind the rest of [his] body" and at times he "truly felt as if [he] was causing more injury to it." (*Id*.) By the end of June 2010, Thompson was able to post bail and leave the prison facility.[5] (*Id*. at 10.) He remained at home until mid-October 2010, when he was sentenced to three-to-fifteen years' imprisonment. (*Id*.) He is presently incarcerated at the Northwest State Correctional Facility ("NWSCF") serving this sentence. (*Id*. at 1.)

According to Thompson, he "still live[s] with this trauma to the present day." (*Id*. at 10.) In addition to the "debilitating effects" of his numerous physical symptoms (*id*. at 1), Thompson claims to suffer "psychological effects" of the injury that "are just as devastating, if not more[,] than the physical effects" (*id*. at 10). He now has posttraumatic stress disorder and "severe" anxiety disorder as a consequence. (*Id*.) Thompson also notes that he has occasional nightmares of his "left arm being amputated at the shoulder," which cause him to awaken to "make sure [his] left shoulder is still properly attached." (*Id*.) Medical staff at NWSCF "continue to ignore [Thompson's] pleas to treat [his] injury despite [his] making numerous verbal pleas and putting in several medical forms." (*Id*. at 1.)

On October 1, 2012, Thompson filed his original Complaint in this Court (Doc. 5), which was subsequently superseded by the Amended Complaint on January 22, 2013 (Doc. 27). In the Amended Complaint, Thompson brings suit against the following

---

[5] Thompson notes that he "had always had bail" money, but chose to remain in prison. (Doc. 27 at 10.) Why he did so, by his description, is "another story to tell at another time." (*Id*.)

Defendants in both their official and individual capacities: Andrew Pallito (the Vermont Commissioner of Corrections); "Prison Health Care Staff ('Corizon') at CCCC (Names Unknown to Plaintiff)"; "Shana [phonetically] (Presently a Caseworker at NWSCF but used to be a Corrections Officer at CCCC)"; "Multiple Unknown Vermont Department of Corrections Officers at CCCC"; "Greg Hale (then Superintendent at CCCC and present Superintendent at NWSCF)"; and "Prison Health Care Staff ('Corizon') at NWSCF (Names Unknown to Plaintiff)."[6]  (Doc. 27 at 1.)  According to Thompson, Hale ignored "at least one" request form directed to him, in which Thompson "alerted" Hale to the fact that "staff continually refused to explain the grievance process to [him]."  (*Id*. at 4.)  After sending a similar request to Pallito, Thompson claims he "never heard back."  (*Id*.)  Thompson also claims that Pallito generally "fail[ed] to provide department staff with adequate training" in light of the response to his injury, as outlined above.  (*Id*. at 2.)  Thompson demands a jury trial and seeks "$3,500,000.00 in total damages."  (*Id*. at 1.)

### Discussion

Title 42 U.S.C. § 1983 provides a civil claim for damages against "[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state

---

[6] References to "Corizon" appear to be responsive to a previously-filed motion to dismiss. Originally, Thompson filed suit against "Prison Health Care," among other Defendants, on the basis of his belief that Prison Health Care was responsible for the medical treatment at the prison facility. According to a Motion to Dismiss filed on behalf of Prison Health Care by Corizon, however, "Corizon was the medical contractor for the Vermont Department of Corrections during the time period Plaintiff alleges to be relevant to his complaints.  Corizon was previously named 'Prison Health Services, Inc.'" (Doc. 14 at 1.)

actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To succeed on a § 1983 claim, a plaintiff must allege that: "(1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)); *see also Albright v. Oliver*, 510 U.S. 266, 271 (1994).

As stated, there are many pending motions that must be addressed. Defendants Pallito, Hale, and "Shana" (collectively, "DOC Defendants") have moved to dismiss Thompson's § 1983 claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. (Doc. 29.) Thompson has also filed a "Motion for Admission of Undisputed Facts from Party Opponents." (Doc. 30.) Before the filing of the Amended Complaint, Thompson filed numerous Motions for Summary Judgment (Docs. 15, 19, 24) as well as a Motion to Respond to the Motions to Dismiss using the Amended Complaint (Doc. 21), and Defendants filed two Motions to Dismiss (Docs. 13, 14). Finally, Thompson has moved for the appointment of counsel. (Doc. 38.)

## I.  Motion to Dismiss for Failure to State a Claim

DOC Defendants have moved to dismiss Thompson's § 1983 claims on multiple grounds. (Doc. 29.) First, they argue that all claims against them in their official

capacities should be dismissed because such suits are barred by Vermont's Eleventh Amendment sovereign immunity.  (*Id*. at 3-4.)  Second, DOC Defendants maintain that the official capacity claims should be dismissed because they are not "persons" as contemplated by the text of § 1983.  (*Id*. at 4-5.)  Third, they argue that all claims against them should be dismissed for Thompson's failure to allege their personal involvement in the claimed constitutional deprivation.  (*Id*. at 5-11.)  Fourth, and finally, DOC Defendants argue that Thompson's claim should be denied on its merits, on the basis that Thompson has failed to allege adequately that Defendants acted with "deliberate indifference" to his medical needs.  (*Id*. at 11-13.)

## A.  Legal Standard for a Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must "provide the grounds upon which [its] claim rests."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  A plaintiff must also allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As described by the Supreme Court in *Iqbal* and *Twombly*, this does not require a plaintiff to provide "detailed factual allegations" to support his claims, but the "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The plaintiff must allege

sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In assessing the adequacy of the pleadings, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff. *See Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011); *ATSI Commc'ns*, 493 F.3d at 98. A complaint is properly dismissed, where, as a matter of law, "the allegations in [it], however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Conversely, this presumption of truth "is inapplicable to legal conclusions," and therefore the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678; *see also Faber v. Metropolitan Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) ("We are not . . . bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

The question on a Rule 12(b)(6) motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'" raised in the complaint. *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the

evidence that might be offered in support of the claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). In essence, the question is whether some plausible narrative supports Plaintiff's claim such that the case merits discovery; the Federal Rules of Civil Procedure "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In cases involving a *pro se* plaintiff, as here, the Court must construe the complaint "liberally," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), by "reading such submissions 'to raise the strongest arguments they suggest.'" *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). "This policy of liberally construing *pro se* [complaints] is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). In assessing *pro se* complaints challenged by Rule 12(b)(6) motions to dismiss, courts "apply[] a more flexible standard to evaluate their sufficiency than we would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of Elections in City of N.Y.*, 232 F.3d 135, 140 (2d Cir. 2000). "This is particularly so when the *pro se* plaintiff alleges that h[is] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008).

Nonetheless, even *pro se* litigants "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal*." *Brickhouse v. City of New York*, No. 09 CIV. 9353, 2010 WL 3341845, at *2 (S.D.N.Y. Aug. 16, 2010); *see Bisson v. Martin Luther King Jr. Health Clinic*, No. 07-5416-cv, 2008 WL 4951045, at *1 (2d Cir. Nov. 20, 2008); *see also Triestman*, 470 F.3d at 477 ("*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law").

### B.    Eleventh Amendment Sovereign Immunity

DOC Defendants first move to dismiss Thompson's § 1983 claims against them in their official capacities, arguing that these claims are barred by Vermont's sovereign immunity under the Eleventh Amendment to the United States Constitution.[7]

"Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).  Pursuant to the doctrine of sovereign immunity, federal jurisdiction over suits against unconsenting states or state officials "was not contemplated by the [C]onstitution when establishing the judicial power of the United States." *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).  Thus, the Eleventh Amendment bars suits seeking damages in federal court by private citizens against a state, its agencies, or its officials

---

[7] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has also been interpreted to bar federal suits against state governments by a state's own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890).

unless the state has waived its immunity or Congress has properly abrogated that immunity.[8]  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984). Any waiver of Eleventh Amendment immunity by a state must be unequivocally expressed.  *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985).

"The [E]leventh [A]mendment also bars suits against state officials and state agencies if the state is the *real* party in interest, regardless of whether the state is named as a party to the action."  *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)).  In contrast to a suit against a state official in his personal capacity, in which an award of damages would be executed only against the official's own assets, an official-capacity suit results in a damages judgment against the state itself.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  As a result, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," which includes extending the state's sovereign immunity to the state official sued in his or her official capacity.  *See id*.  Otherwise, the state could be subject to a damages claim that would otherwise be barred had it been brought directly against the state.

Vermont has not waived its sovereign immunity under § 1983.  *See* 12 V.S.A. § 5601(g) (Vermont Tort Claims Act reserves Eleventh Amendment immunity for all claims not specifically waived).  Thus, Vermont state officials cannot be subject to suit in their official capacities for retrospective relief, such as money damages, under § 1983.

---

[8]  Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), but it has not done so in any way relevant to this case.  It is well settled that Congress did not intend to abrogate sovereign immunity by the enactment of § 1983.  *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979).

Each DOC Defendant is an official with the Vermont DOC. Defendant Pallito is the DOC Commissioner, Defendant Hale is a superintendent at a DOC facility, and Defendant Shana is an employee of a DOC facility. As state employees, they are entitled to the protection of the state's sovereign immunity when sued in their official capacities. Accordingly, as Thompson seeks only money damages, all § 1983 claims against these Defendants in their official capacities should be DISMISSED.

DOC Defendants also correctly argue that the claims against them in their official capacities should be dismissed because "[n]either a state nor one of its agencies nor an official of that agency sued in his or her official capacity is a 'person' under § 1983." *Spencer v. Doe*, 139 F.3d 107, 111 (2d Cir. 1998) (citing *Hafer v. Melo*, 502 U.S. 21, 26 (1991)); *see also Will*, 491 U.S. at 71 ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Accordingly, I recommend that Thompson's § 1983 claims against DOC Defendants in their official capacities be DISMISSED on this basis as well.

### C. Personal Involvement

Next, DOC Defendants argue that all claims against them, in both their personal and official capacities, should be dismissed for Thompson's failure to allege their personal involvement.

To recover damages under 42 U.S.C. § 1983, a plaintiff must allege the personal involvement of each of the individual defendants. *See Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991) ("personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983"). In this way, a prison official cannot be held personally liable under § 1983 on the basis of *respondeat superior* or simply because he or she sits atop the prison hierarchy. *See Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995). That being said, direct participation is not strictly necessary. Personal involvement can be shown by any of five categories of misconduct:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

Neither Pallito nor Hale had any direct involvement in Thompson's medical treatment (or lack thereof). The primary allegations of their involvement are that, according to Thompson, both men failed to respond to his letters, sent directly to each of them, detailing the deficiencies of the DOC staff.[9] (Doc. 27 at 4.) In addition, Thompson alleges that Pallito "has and continues to fail to provide department staff with adequate training." (*Id*. at 2.) Thus, on the basis of the allegations in the Amended Complaint, Thompson's case may arguably fit into either of two *Colon* categories for personal

---

[9] In their Motion, DOC Defendants briefly argue that Thompson's allegations regarding Pallito and Hale's failure to respond to his letters are "legal conclusion[s]" that "should not be accepted as true." (Doc. 29 at 7.) This is incorrect. Legal conclusions are such things as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. This allegation does not fit that bill.

involvement: that Pallito and Hale "failed to remedy the wrong" after having been informed of the violation by letter, or that Pallito acted "grossly negligent" in his supervision of his subordinates. *Colon*, 58 F.3d at 873.

DOC Defendants argue that these two *Colon* categories, far removed as they are from allegations of direct personal involvement in the claimed constitutional violations, did not survive the Supreme Court's post-*Colon* decision in *Iqbal* because they permit § 1983 liability for Defendants' conduct as supervisors. In *Iqbal*, a *Bivens* action[10] alleging that federal officials willfully violated the First and Fifth Amendments, the Supreme Court reiterated that "vicarious liability is inapplicable to *Bivens* and § 1983 suits," such that "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Iqbal*, 556 U.S. at 676 (emphasis added). It explicitly rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," stating: "In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer." *Id*. at 677. According to the Supreme Court, "purpose rather than knowledge is required" to hold an official responsible for "violations arising from his or her superintendent responsibilities." *Id*. By DOC Defendants' estimation, this means that *Iqbal* "narrows or eliminates" all *Colon* categories premised upon the exercise of

---

[10]  In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court recognized, for the first time, "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). Put another way, *Bivens* is to federal actors as § 1983 is to state actors—it permits a civil cause of action for constitutional violations.

supervisory authority, such that the two categories in question here cannot support a finding of personal involvement as required under § 1983. (Doc. 29 at 8.)

There has been considerable debate and disagreement within this circuit as to how much of the *Colon* test remains viable after *Iqbal*. The Second Circuit has not yet definitively stepped into the breach. *But see Rolon v. Ward*, 345 F. App'x 608, 611 (2d Cir. 2009) (summary order) (noting, in a summary order four months after *Iqbal*, that "[a] supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others"); *see also Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (noting conflict between *Iqbal* and *Colon*, but declining to identify those categories that remain because "the fate of *Colon* [was] not properly before" the court); *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (reaffirming, in dicta, the third *Colon* category).[11] Some district courts within the Second Circuit have disallowed any § 1983 supervisory liability after *Iqbal*, effectively abrogating *Colon*. *See Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 F. App'x 55 (2d Cir. 2010) ("Only the first and part of the third *Colon* categories pass *Iqbal*'s muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a

---

[11] This uncertainty as to the continued viability of supervisory liability claims is reflected in the decisions of the Courts of Appeals for other circuits. *See, e.g.*, *Argueta v. United States Immigration & Customs Enforcement*, 643 F.3d 60, 70 (3d Cir. 2011); *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010); *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

policy or custom under which unconstitutional practices occurred."); *Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal*."); *Joseph v. Fischer*, No. 08 Civ. 2824(PKC)(AJP), 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009). Others have reaffirmed the continued vitality of all five *Colon* categories. *See D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (concluding that all five categories survive *Iqbal* because "*Colon*'s bases for liability are not founded on a theory of *respondeat superior*, but rather on a recognition that personal involvement of defendants in alleged constitutional deprivations can be shown by nonfeasance as well as misfeasance." (quotation omitted)); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010).[12] This latter approach seems to reflect the majority position. *Toliver v. N.Y.C. Dep't of Corr.*, No. 10 Civ. 5804(AKH)(JCF), 2012 WL 5426658, at *4 (S.D.N.Y. Oct. 10, 2012) ("the majority view is where the constitutional claim does not require a showing of discriminatory intent . . . the personal involvement

---

[12] In another decision, the United States District Court for the Southern District of New York rejected *Iqbal*'s abrogation of *Colon* in greater detail:

> These decisions [abrogating *Colon*] may overstate *Iqbal*'s impact on supervisory liability. *Iqbal* involved alleged intentional discrimination. *Ashcroft v. Iqbal*, 129 S.Ct. at 1942. The Supreme Court specifically held that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Ashcroft v. Iqbal*, 129 S.Ct. at 1948. Where the alleged constitutional violation involved "invidious discrimination in contravention of the First and Fifth Amendments," *Iqbal* held that "plaintiff must plead and prove that the defendant acted with discriminatory purpose," whether the defendant is a subordinate or a supervisor. *Ashcroft v. Iqbal*, 129 S.Ct. at 1948–49. It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Ashcroft v. Iqbal*, 129 S.Ct. at 1949. Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.

*Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009).

analysis set forth in *Colon v. Coughlin* may still apply" (quotations omitted)), *adopted*, 2012 WL 5429659 (S.D.N.Y. Nov. 7, 2012).

Here, because Thompson has not asserted intent-based claims—instead relying upon the "deliberate indifference" standard of the Eighth and Fourteenth Amendments—and because no decision from the Second Circuit has explicitly overruled *Colon*, I follow the majority position within the district courts of this circuit and decline the DOC Defendants' invitation to eliminate all forms of supervisory liability under § 1983. Accordingly, I apply the categories of personal involvement as established by the Second Circuit in *Colon*.

Applying these categories as to Pallito and Hale, Thompson claims that both men "failed to remedy the wrong," in the language of *Colon*, after he "never heard back" from either despite sending each a letter detailing the deficiencies of their subordinates. (Doc. 29 at 4.) "Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim." *Candelaria v. Higley*, No. 04-CV-277A, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (collecting cases). The district courts of this circuit appear to be in unanimous agreement that a supervisory official having received (and ignored) a letter from an inmate alleging unconstitutional conduct does not, without more, give rise to personal involvement on the part of that official. *See Bennett v. Nesmith*, Civil Action No. 9:09-CV-0515 (GLS/DEP), 2010 WL 1948326, at *3 (N.D.N.Y. Apr. 6, 2010); *Stutes v. Tipton*, 540 F. Supp. 2d 516, 519-20 (D. Vt. 2008); *Anderson v. Ford*, Civ. No. 3:06CV1968 (HBF), 2007 WL 3025292, at *6-7 (D. Conn. Oct. 16, 2007); *Brooks v. Chappius*, 450 F. Supp. 2d 220,

225-26 (W.D.N.Y. 2006); *Thomas v. Coombe*, No. 95 Civ. 10342(HB), 1998 WL

391143, *6 (S.D.N.Y. July 13, 1998); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.

1997) (affirming dismissal of case where personal involvement of official was limited to

having received two letters from inmate); *Goris v. Breslin*, 402 F. App'x 582, 584 (2d

Cir. 2010); *Wright v. Smith*, 21 F. 3d 496, 501 (2d Cir. 1994). "The reason for this rule

appears to be the fact that high-level DOCS officials delegate the task of reading and

responding to inmate mail to subordinates, and, thus, a letter sent to such an official often

does not constitute actual notice." *Voorhees v. Goord*, No. 05 Civ. 1407(KMW)(HBP),

2006 WL 1888638, at *5 (S.D.N.Y. Feb. 24, 2006) (citation omitted). "Were it

otherwise, virtually every prison inmate who sues for constitutional torts by [prison

officials] could name the [supervisor] as a defendant since the plaintiff must pursue his

prison remedies, and invariably the plaintiff's grievance will have been passed upon by

the [supervisor]." *Thompson v. New York*, No. 99CIV9875(GBD)(MHD), 2001 WL

636432, at *7 (S.D.N.Y. Mar. 15, 2001). In this way, imposing liability upon a

supervisory official for failing to respond to an inmate's letter or grievance would

contravene the black-letter principle that § 1983 does not allow for *respondeat superior*

liability. Thompson's allegation that Pallito and Hale failed to respond to his letters

describing his plight is therefore insufficient to establish the requisite personal

involvement on the part of these Defendants.

Next, Thompson alleges, in only the most general terms, that Pallito "has and

continues to fail to provide department staff with adequate training." (Doc. 27 at 2.)

Such vague and conclusory allegations of a failure to supervise and adequately train do

not suffice to establish the requisite personal involvement of a supervisory prison official to support a § 1983 claim. *See Styles v. Goord*, 431 F. App'x 31, 33 (2d Cir. 2011) (summary order) (affirming grant of summary judgment for prison officials where inmate "did not allege, or submit evidence demonstrating, any facts concerning [the prison officials'] particular conduct in supervising their subordinates"); *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the extent that the complaint attempts to assert a failure-to-supervise claim . . . [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [the inmate's] constitutional rights."); *Webster v. Fischer*, 694 F. Supp. 2d 163, 179 (N.D.N.Y. 2010); *Bennett*, 2010 WL 1948326, at *4; *McFadden v. Roy*, Nos. 03-CV-0931 LEK/DRH, 04-CV0799 LEK/DRH, 2006 WL 2787457, at *3 (N.D.N.Y. Sept. 26, 2006) ("simply regurgitating the relevant personal involvement standard will not suffice to survive dismissal"). Thompson provides no additional factual allegations to support this "failure to train" portion of his claim that would permit a proper finding of personal involvement. As a result, Thompson has inadequately alleged Pallito's personal involvement in the claimed constitutional violations on the basis of his gross negligence in failing to train his subordinates.

In sum, all claims against Defendants Hale and Pallito, in both their individual and official capacities, should be DISMISSED for lack of personal involvement.

Defendant Shana also moves to dismiss for lack of personal involvement. According to the Amended Complaint, Thompson alleges that, during his first seizure, Shana, who was working as a corrections officer at the prison facility at the time, held a

video camera, stood over him, and generally engaged in verbal taunting (along with other officers) that suggested Thompson may have been faking the episode. (Doc. 27 at 3.)

In arguing that the claims against her should be dismissed for lack of personal involvement, Shana conflates the personal involvement inquiry with the merits of the case. She argues that Thompson has not alleged "that Defendant Shana had any involvement in [his] medical treatment or non-treatment" and, despite the allegations of taunting, "alleges nothing further that sufficiently links the comment to any failure to provide adequate medical care." (Doc. 29 at 10.) In other words, Shana contends that she was not personally involved because, to the extent she was involved, the conduct she allegedly participated in did not violate the constitution. Her argument thus recast, this is obviously not a matter that can be decided at the threshold inquiry of personal involvement. Only a proper assessment of the merits of the case can resolve the question of whether Shana's conduct, as well as that of the other Defendants, rose to the level of a constitutional violation. I proceed to that issue.

### D. The Merits of Thompson's Constitutional Claim

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII. According to the Supreme Court, this includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To establish an Eighth Amendment claim arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The Eighth Amendment, however, applies only after an individual has been adjudged guilty of a crime. The state cannot "punish" an individual in any manner— cruelly or otherwise—until this condition has been met. At the time of the events set forth in the Amended Complaint, Thompson was not a convicted inmate; he was a pretrial detainee. Deprivations of care of pretrial detainees are reviewed as violations of the due process clause of the Fourteenth Amendment (for state detainees such as Thompson)[13] rather than the prohibition on cruel and unusual punishment of the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."). Despite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, the applicable legal standard is identical. "[T]he official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996); *see also Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *Kelsey v. City of New York*, 306 F. App'x 700, 702 (2d Cir. 2009); *Cuoco*

---

[13] The due process clause of the Fifth Amendment protects federal pretrial detainees. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (applying Fifth Amendment to a federal detainee).

*v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000); *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 243-44 (1983) ("the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner").  The other circuits to have examined this question are in broad agreement.  *See Caiozzo*, 581 F.3d at 71 n.4 (collecting cases).  Thus, the source of the constitutional right is of little consequence.  Properly analyzed under the Fourteenth Amendment, the same "deliberate indifference" standard applies to Thompson's claim.

Whether brought under the Eighth or Fourteenth Amendment, a "deliberate indifference claim is not valid unless it meets certain objective and subjective criteria." *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007).  The objective prong looks to the severity of the alleged deprivation while the subjective prong asks whether the prison official acted with a sufficiently culpable state of mind.  *See Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).

The objective prong is met where the alleged deprivation is "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of" a constitutional violation.  *Id.*  (Internal quotation omitted.)  In the context of a deprivation of medical care, this objective inquiry actually involves two subsidiary questions: whether "(a) the prisoner was actually deprived of adequate medical care, meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) the inadequacy in medical care is sufficiently serious."

*Bellotto*, 248 F. App'x at 236 (internal quotations and citations omitted). If prison officials are alleged to have acted unreasonably by denying the individual needed medical care, the court must then evaluate the seriousness of the prisoner's medical condition. *Id.* While there is no "precise metric" by which to measure the severity of the condition, the standard "contemplates a condition of urgency that may result in degeneration or extreme pain" and "actual medical consequences are highly relevant." *Id.* (internal quotations and citations omitted). Pain need not be extreme or entirely disabling to merit constitutional protection, *see Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003), but "[t]rivial or insignificant conditions do not fall within the scope of" the Fourteenth Amendment, *Pabon v. Goord*, No. 99 Civ. 5869(THK), 2003 WL 1787268, at *2 (S.D.N.Y. Mar. 28, 2003). If the alleged unreasonable action involves a failure to provide any treatment whatsoever for the inmate's medical condition, "courts examine whether the inmate's medical condition is sufficiently serious." *Salahuddin*, 467 F.3d at 280. If, on the other hand, a prisoner alleges an interruption of otherwise-adequate medical services, the Second Circuit focuses "on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Bellotto*, 248 F. App'x at 236. (internal quotations and citations omitted).

The second, subjective component of the "deliberate indifference" inquiry asks whether the charged official acted "with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280. An "inadvertent failure to provide adequate medical care cannot be said to constitute" deliberate indifference. *Estelle*, 429 U.S. at 105. Instead,

the "deliberate indifference" mental state "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280. Although the prisoner is not required to establish that the official acted "for the very purpose of causing harm or with knowledge that harm will result," he must establish that "the official was aware of facts from which one could infer that a substantial risk of serious harm exists, and that the official drew that inference." *Bellotto*, 248 F. App'x at 236-37 (internal quotations and citations omitted). In other words, an official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety." *Smith*, 316 F.3d at 184 (internal quotations and citation omitted). Mere negligence, even if it rises to the level of medical malpractice, is not enough to satisfy the state of mind requirement. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves . . . a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) (a medical practitioner who "delay[s] . . . treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

Thompson's claim against the DOC Defendants fails on this latter prong of the deliberate indifference inquiry. Even assuming the objective seriousness of Thompson's medical problems,[14] none of the allegations in Thompson's Amended Complaint indicate that any of these three Defendants acted with a sufficiently culpable state of mind as to

---

[14] DOC Defendants have not argued that Thompson failed to plead an objectively-serious injury.

the risks associated with Thompson's condition and treatment.  According to Thompson, he sent Defendant Hale a "request form . . . alerting him to the fact that staff continually refused to explain the grievance process to [him]."  (Doc. 27 at 4.)  Thus, by Thompson's own description, he did not even try to alert Hale to the deficiencies in his treatment.  As to Defendant Pallito, Thompson states that he sent a similar request describing the failure to teach him how to use the grievance process "as well as the deliberate indifference to [his] serious medical needs."  (*Id.*)  Just as it does not establish Pallito's personal involvement, such a letter also cannot establish his deliberate indifference.  In no way is it alleged that Pallito was made aware of and intentionally disregarded a risk to Thompson's health, and, given his lack of medical training, he was "permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to" Thompson.  *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002).

Similarly, none of the allegations against Defendant Shana demonstrate her culpable state of mind.  Shana's alleged verbal taunting of Thompson is not actionable, *see Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (collecting cases), while her failure to assist Thompson during his seizure cannot support a finding of deliberate indifference where no facts are alleged that demonstrate her comprehension of the medical risks associated with Thompson's condition.  In any event, Thompson was ultimately taken to the hospital after this first seizure, and does not allege that, at that time, he was provided with inadequate treatment.  Instead, the allegedly deficient treatment arose later that day, as well as in the weeks and months of protracted delays in

providing shoulder surgery and physical therapy. Such delays are not attributable to any of Shana's actions as alleged in the Amended Complaint.

Accordingly, the Fourteenth Amendment due process claims against all three DOC Defendants should be DISMISSED on the merits.[15]

### E. Remaining Defendants

For the various reasons set out above, all § 1983 claims against DOC Defendants—Pallito, Hale, and Shana—should be DISMISSED. But this does not end the matter. In the Amended Complaint, Thompson brings suit against three additional Defendants, none of whom are party to the pending Motion to Dismiss: "Prison Health Care Staff ('Corizon') at CCCC (Names Unknown to Plaintiff)"; "Multiple Unknown Vermont Department of Corrections Officers at CCCC"; and "Prison Health Care Staff ('Corizon') at NWSCF (Names Unknown to Plaintiff)." (Doc. 27 at 1.)

In his response to DOC Defendants' Motion to Dismiss, Thompson requests default judgment, in the amount of $3,500,000, against these three remaining Defendants for their "failure to file a timely Motion to Dismiss in violation of Federal Rules of Civil Procedure." (Doc. 33 at 7.) Obviously, default judgment should not enter where

---

[15] DOC Defendants maintain that, to the extent Thompson alleges that he was denied access to the grievance process, such an allegation is insufficient to raise a cognizable First Amendment claim that this restricted access unduly infringed his right to petition the government for redress of grievances. (Doc. 29 at 5.) This appears to be correct. *See Harris v. Westchester Cnty. Dep't of Corr.*, No. 06 Civ.2011(RJS), 2008 WL 953616, at *5 (S.D.N.Y. Apr. 3, 2008). But Thompson has raised no such claim. (Doc. 33 at 4.) He did allege that prison officials refused to explain the grievance system to him (Doc. 27 at 4), but did so, one can only assume, to explain his failure to exhaust his administrative remedies, which is generally a prerequisite to a viable § 1983 claim. *See* 42 U.S.C. § 1997e(a). Non-exhaustion bars § 1983 claims, however, only when raised as an affirmative defense. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) ("failure to exhaust is an affirmative defense"). Defendants have not asserted this defense, so it is now waived. *See Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) ("court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it").

Thompson has failed to identify the Defendants in question, and, as a result, they have not yet been served with the Amended Complaint and summons. Without having been identified and served, they can hardly be expected to appear and answer. *See Harris v. United States Dep't of Justice*, 600 F. Supp. 2d 129, 136-37 (D.D.C. 2009) (declining to enter default judgment against defendants who had never been served with process); *Lichtenstein v. Jewelart, Inc.*, 95 F.R.D. 511, 513 (E.D.N.Y. 1982) ("the extreme sanction of a default judgment should be employed only as a last resort").

Based upon Thompson's general description of these remaining Defendants, it appears that he is not currently aware of the identity of those directly responsible for his allegedly-inadequate medical treatment. "While a plaintiff generally cannot bring a claim against an unidentified person, the rule is not applied strictly against pro se plaintiffs, especially when incarcerated . . . ." *Warren v. Goord*, 476 F. Supp. 2d 407, 413 (S.D.N.Y. 2007). In *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), the Second Circuit recognized that a *pro se* litigant may be entitled to assistance from a district court in ascertaining the identity of a unidentified defendant. A case involving a *pro se* inmate, in particular, provides a "paradigmatic example" of why such assistance may be necessary: "[f]rom his place of incarceration, it is hard to see what investigative tools would be at his disposal to obtain further information on [the defendant's] identity." *Id*. at 75; *see also Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981) ("[I]nstead of dismissing a complaint because it fails to identify certain unnamed defendants, the district court should order their disclosure or permit the plaintiff to obtain their identity through discovery. . . . As a pro se inmate of a state prison, [plaintiff] is at a distinct disadvantage

in trying to discover the identity of those who were directly responsible for the delay in his treatment. This difficulty should not be used to prevent him from seeking relief on an otherwise meritorious claim."). Indeed, "a district court has an *obligation* to assist an incarcerated *pro se* litigant to obtain discovery necessary to identify an unidentified individual defendant in order to avoid dismissal." *Wilson v. 103RD Precinct*, 182 F.3d 902, 1999 WL 494868, at \*2 (2d Cir. 1999) (unpublished opinion) (emphasis added).[16] Pursuant to *Valentin*, the district court is empowered with broad discretion to attempt to ascertain the identity of the defendants in question. *See id*. at 76 ("The district court may pursue any course that it deems appropriate to a further inquiry into the identity of [the unidentified defendant].").

The allegations against the unnamed prison officials are serious, but, without additional details, it may prove impossible to identify these individuals. Accordingly, although I recommend dismissal of the claims against the DOC Defendants, counsel for these Defendants, the Vermont Attorney General's Office, is nonetheless ordered to release forthwith to Thompson all reports regarding his medical treatment, and to assist Thompson in ascertaining the identities of all individuals involved in his medical treatment for the period September 2009 to June 2010. The Attorney General's Office is also requested to provide the address where these individuals can be currently served. The Attorney General's Office need not undertake to defend or indemnify these

---

[16] Although the Second Circuit "do[es] not require a district court to bring up the issue of discovery or prompt the defendant to seek such discovery," *Wilson*, 1999 WL 494868, \*2, "neither does it prohibit the district court from doing so *sua sponte*," *Snoussi v. Bivona*, No. 05 CV 3133(RJD)(LB), 2008 WL 3992157, at \*3 (E.D.N.Y. Aug. 22, 2008).

individuals at this juncture. This order merely provides a means by which Thompson may name and properly serve the Defendants as instructed by the Second Circuit in *Valentin*.

This assistance must be rendered within 30 days of the District Court's Order with regard to this Report and Recommendation. If this information cannot be provided, the Attorney General's Office must submit a detailed explanation of why it has been unable to do so, specifically identifying what steps it has taken to acquire the information in question. Should this information be provided, Thompson should be granted leave to file a Second Amended Complaint naming those individuals he intends to sue no later than 30 days after receiving the identifying information. This amended complaint "should be complete enough to enable a reader to understand how each defendant was personally involved in the wrongdoing plaintiff is alleging." *Onwuka v. Taxi Limousine Commission*, No. 10-CV-5399(SLT)(LB), 2012 WL 3043202, at *2 (E.D.N.Y. July 25, 2012). "Once plaintiff has provided a description of the events that give rise to this action, plaintiff should explain why he claims each of the defendants is liable." *Id*. "Finally, plaintiff should state what remedies he seeks from each of the defendants." *Id*. Thompson's failure to comply with this deadline may result in the dismissal of his entire Amended Complaint pursuant to Fed. R. Civ. P. 41.

## II. Thompson's "Motion for Admission of Undisputed Facts from Party Opponents"

Next, Thompson moves for the "Admission of Undisputed Facts from Party Opponents," in which he "seek[s] admission from party opponents" of a seven-page list

of fifty-six numbered facts. (Doc. 30.) In essence, this Motion seeks to have Defendants admit all of the facts as set out in the Amended Complaint.

This is not a cognizable motion. A party may not move, in the first instance, to ask a court to demand that an opponent admit to certain listed facts. Instead, the party may submit to their opponent requests for admission, pursuant to Rule 36 of the Federal Rules of Civil Procedure. Rule 36 governs the process through which a party to an action may request other parties to admit the truth of any matter within the scope of Rule 26(b), so as to "reduce the costs of litigation by eliminating the necessity of proving facts that are not in substantial dispute, to narrow the scope of disputed issues, and to facilitate the presentation of cases to the trier of fact." *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co., Inc.*, 174 F.R.D. 38, 42 (S.D.N.Y. 1997) (citing *Donovan v. Carls Drug Co., Inc.*, 703 F.2d 650, 652 (2d Cir. 1983)). If he wishes to do so, Thompson is advised to follow the process described in Rule 36 for requests for admissions. Thereafter, "[t]he party seeking the admission may move to test the sufficiency of any response to his or her request." *Apex Oil Co. v. Belcher Co. of N.Y., Inc.*, 855 F.2d 1009, 1015 (2d Cir. 1988).

Accordingly, Thompson's "Motion for Admission of Undisputed Facts from Party Opponents" (Doc. 30) should be DENIED.

## III.    Motions Filed Before Amendment of Complaint

As stated, a number of pending motions predate the filing of the Amended Complaint. These include Motions to Dismiss by Defendants (Docs. 13, 14), Motions for

Summary Judgment by Thompson (Docs. 15, 19, 24), and a motion to "respond to the . . . motions to dismiss using [the] amended complaint" (Doc. 21).

All of these motions have been overtaken by events, specifically, the filing of the Amended Complaint. "It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation omitted). As a consequence, motions addressed to the original complaint are generally regarded as moot upon the filing of an amended complaint. *See Praileau v. Fischer*, No. 1:12-CV-1261(GTS/RFT), 2013 WL 936447, at *3 (N.D.N.Y. Mar. 8, 2013) ("Typically, the filing of an amended complaint following the filing of a motion to dismiss the initial complaint moots the motion to dismiss." (quotation omitted)); *Rathke v. HCA Mgmt. Co., Inc.*, No. 89-4128-S, 1989 WL 161431 at *1 n.1 (D. Kan. Dec. 27, 1989) ("[T]he court finds that [the] motion to dismiss . . . became moot when plaintiff filed an amended complaint"); *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1447 n.1 (N.D. Ga. 1984) ("Defendant's motion to dismiss plaintiff's original complaint became moot upon plaintiff's filing of an amended complaint as a matter of course during the pendency of the motion"); *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 493 F. Supp. 499, 501 (S.D.N.Y. 1980) ("Since the original complaint has been superseded by the amended complaint, the motion to dismiss the original complaint has been rendered moot").

But the Court may choose from a "variety of ways" in which to deal with such motions—"from denying the motion[s] as moot to considering the merits of the motion[s] in light of the amended complaint." *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 80

(D. Conn. 1994). Here, a number of factors counsel in favor of treating the motions as moot. First, the Motions to Dismiss (Docs. 13, 14) are not only moot because of the filing of the Amended Complaint, but also because, as to all identified Defendants (Pallito, Hale, and Shana), I have already recommended dismissal. *See Bimler v. Stop & Shop Supermarket Co.*, 965 F. Supp. 292, 296 (D. Conn. 1997) (denying original motion to dismiss where second such motion was filed after amendment of complaint because "there is no need to separately decide both the original and the second motions to dismiss"). The two original motions to dismiss were also filed by entities that are no longer parties to this case. The Defendants who moved to dismiss in these earlier motions (Staff at Chittenden County Correctional Facility, Vermont Department of Corrections, and Prison Health Care) are not even listed as Defendants in Thompson's Amended Complaint. Motions to dismiss filed by non-parties should be denied as moot. *See Pope Invs. II, LLC v. Deheng Law Firm*, No. 10 Civ. 6608(LLS), 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012).[17]

Similarly, the pending Motions for Summary Judgment (Docs. 15, 19, 24) should be denied as moot. The Motions are both directed at the original Complaint and were filed before there has been an "adequate time for discovery." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Indeed, there has been *no* time at all for discovery in this case, as discovery has yet to commence, and Thompson has also made no effort to comply with the relevant local rule governing motions for summary judgment. *See* Local Rule 56.

---

[17] Only Pallito was listed as a Defendant in both the original and Amended Complaint. Having recommended that the case against him be dismissed, however, his presence as an original defendant does not alter the fact that these motions are moot.

Given the numerous deficiencies with Thompson's Motions for Summary Judgment, the better course is to deny the non-complying Motions as moot to avoid addressing issues going to the merits of the case at this early stage of the litigation, before discovery has even begun.

Thompson's final pre-amendment motion, in which he requests permission to respond to the motions to dismiss using his Amended Complaint (Doc. 21), should be denied as moot because he has already filed such a response (Doc. 33).

All motions filed before the Amended Complaint (Doc. 13, 14, 15, 19, 21, 24) should be DENIED AS MOOT.

## IV.    Motion for Appointment of Counsel

Finally, in his response to DOC Defendants' Motion to Dismiss, Thompson requests that counsel be appointed to represent him. (Doc. 38.) Thompson previously moved for the appointment of counsel (Doc. 19-1 at 2), which I denied in an earlier order (Doc. 26 at 6).

As I noted at that time, "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case." *Leftridge v. Conn. State Trooper Officer # 1283*, 640 F.3d 62, 68 (2d Cir. 2011); *see also United States v. Coven*, 662 F.2d 162, 176 (2d Cir. 1981). Nevertheless, a party granted *in forma pauperis* status may request the Court for the appointment of an attorney if unable to afford one on his or her own. *See* 28 U.S.C. § 1915(e)(1). There are no court funds to pay for counsel's services. The district judge is granted "broad discretion" in making this decision. *See Hodge v Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986). As a threshold requirement, the court must first

"determine whether the indigent's position seems likely to be of substance." *Rivas v. Suffolk County*, Nos. 04-4813-pr (L), 04-5198-pr (Con), 2008 WL 45406, at *1 (2d Cir. Jan. 3, 2008) (quoting *Hodge*, 802 F.2d at 61). The Court should then assess: (1) the party's ability to investigate the crucial facts; (2) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (3) the party's ability to present the case; (4) the complexity of the legal issues; and (5) any other special reason in the case why appointment of counsel would be more likely to lead to a just determination. *Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (citing *Hodge*, 802 F.2d at 61-62).

There is continued uncertainty as to the merits of Thompson's claim. While I have recommended dismissal of all claims against DOC Defendants, additional information provided by counsel for DOC Defendants, pursuant to *Valentin*, may shed light on the facts surrounding Thompson's treatment, and thus the merits of his underlying claim against any identifiable individuals. Once this information is provided and a second amended complaint filed, it may become apparent that Thompsons is unable to litigate the case competently without counsel. At that time, Thompson may request counsel. At this point, I recommend that Thompson's Motion to Appoint Counsel (Doc. 38) again be DENIED without prejudice.

## Conclusion

For the reasons set out above, I recommend that the most recent Motion to Dismiss filed by Defendants Pallito, Hale, and Shana (Doc. 29) be GRANTED. Although I recommend dismissal of the claims against the DOC Defendants, I further

recommend counsel for these Defendants, the Vermont Attorney General's Office, be ordered to release forthwith to Thompson all reports regarding his medical treatment, and to assist Thompson in ascertaining the identities of all individuals involved in his medical treatment for the period September 2009 to June 2010. I also recommend that the Attorney General's Office be ordered to provide the address where these individuals can be currently served. The Attorney General's Office need not undertake to defend or indemnify these individuals at this juncture. If adopted, this order would merely provide a means by which Thompson may name and properly serve the potential Defendants as instructed by the Second Circuit in *Valentin*. This assistance must be rendered within 30 days of the Court's order with regard to this Report and Recommendation. If this information cannot be provided, I recommend the Attorney General's Office be ordered to submit a detailed explanation of why it has been unable to do so, specifically identifying what steps it has taken to acquire the information in question. Should this information be provided, Thompson may file a Second Amended Complaint naming those individuals he intends to sue no later than 30 days after receiving the identifying information. Thompson's failure to comply with this deadline may result in the dismissal of his entire Amended Complaint pursuant to Fed. R. Civ. P. 41.

As to the remaining motions, I recommend that Thompson's "Motion for Admission of Undisputed Facts from Party Opponents" (Doc. 30) be DENIED. I further recommend that all motions filed prior to the Amended Complaint (Docs. 13, 14, 15, 19, 21, 24) be DENIED AS MOOT. Thompson's Motion to Appoint Counsel (Doc. 38)

should be DENIED without prejudice.  Finally, Thompson's Motion for Default

Judgment (Doc. 38) should be DENIED.

Dated at Burlington, in the District of Vermont, this 30th day of April, 2013.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after
service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge
and all parties, written objections which shall specifically identify those portions of the
Report and Recommendation to which objection is made and the basis for such
objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).
Failure to timely file such objections "operates as a waiver of any further judicial review
of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15,
16 (2d Cir. 1989).